# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, )<br><br>Plaintiff, )<br><br>STEVEN WHITLOW, )<br><br>Intervenor Plaintiff, )<br>v. )<br><br>COGNIS CORPORATION, )<br><br>Defendant. ) | **Case No. 10-CV-2182** |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#29) filed by the Defendant, Cognis Corporation ("Cognis"). This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Defendant's Motion for Summary Judgment (#29) is DENIED.

### FACTS[1]

### I. STEVEN WHITLOW—CHARGING PARTY

Steven Whitlow ("Whitlow"), Intervenor Plaintiff, was employed by Cognis and its predecessors at a facility in Kankakee, Illinois, for approximately 19 years. During the period of time between May 2006 and May 10, 2007, Whitlow undisputedly was disciplined

---

[1]The facts are taken from the parties' statement of undisputed facts and the documents submitted by the parties. This court has only included facts which are adequately supported by evidence in the record and that are material for purposes of summary judgment.

for numerous performance related issues.[2]  As a result, Cognis issued verbal warnings, issued

a disciplinary suspension, and even held a formal counseling session to try to resolve these

performance issues.[3]  On May 10, 2007, in lieu of termination, Whitlow was presented with a

Last Chance Agreement ("LCA") by Cognis representatives, who explained that he was

receiving the LCA due to his failure to meet performance expectations.  The relevant

language of the LCA provided:

> Cognis has decided to offer Whitlow one last chance to continue his employment in
> lieu of termination and Whitlow has decided to accept the terms of this Agreement as
> his last chance to retain his employment. . . . [I]n consideration of the mutual
> covenants herein contained, the parties agree as follows:
>
> > 1. The Company agrees to offer Whitlow the opportunity to retain his position.
> > Whitlow agrees to fully comply with all requirements of the job.
> > . . .
> > 3. The Company and Whitlow agree that this [LCA] shall remain in full force
> > and effect during the next two years.
> >
> > 4. Whitlow agrees that in the event that he does not meet performance
> > expectations, or violates any of the Company's rules or regulations, receives
> > any discipline, receives any operating errors, or is absent or misses any more
> > work his employment will be immediately terminated without recourse to the
> > grievance or arbitration provision of the collective bargaining agreement, or to
> > any agency, federal, state, or municipal court.
> > . . .
> > 7.  For and in consideration of the mutual promises set forth herein, Whitlow
> > does hereby release and waive any claim of liability against Cognis, its
> > affiliates, partners, agents and employees, for, on account of, or in relation to

---

[2]Although the parties go into great depth about these performance issues and related
responses by Cognis, these facts are not material to the critical aspect of this case on summary
judgment—namely whether Cognis retaliated against Whitlow by offering the LCA.

[3]At some point in early April 2007, Whitlow allegedly complained to the plant manager,
Denny Ohlmansiek, that he believed he was being discriminated against on the basis of his race.
Nevertheless, Plaintiffs do not argue that Whitlow was retaliated against based on this initial
compliant of discrimination, so this fact is not material to this case.

> Whitlow's rights' [to] employment with Cognis or its affiliates, or his status under this [LCA], and agrees not to commence any action or proceeding, including but not limited to any common law claim or statutory claim under Title VII of the Civil Rights Act of 1964, and similar state or local fair employment practices law, regulations, or ordinance, the Age Discrimination in Employment Act (ADEA), the Rehabilitation Act of 1973, or the Americans with Disabilities Act of 1990 (ADA), the National Labor Relations Act (NLRA), the Family and Medical Leave Act (FLMA), or before any state, federal or court or administrative agency, civil rights commission or agency, or any other forum.

Whitlow understood, accurately, that if he did not agree to each of the terms contained in the LCA he would be immediately terminated by Cognis. On May 11, 2007, Whitlow submitted the signed LCA to Beverly Lemenager ("Lemenager"), a Cognis Human Resource Manager.[4] Thereafter, Whitlow continued working for Cognis in the exact same role as he had prior to entering into the LCA. Between May 10, 2007, and May 21, 2007, Cognis had no problems with Whitlow's job performance.

Despite initially signing the LCA, Whitlow questioned whether he had made the correct decision to waive the rights outlined in the LCA. Specifically, he contacted the National Association for the Advancement of Colored People ("NAACP") to discuss the LCA. Following this conversation, the NAACP sent a letter dated May 18, 2007, to Cognis indicating that it had concerns of discrimination taking place at the Cognis facility in Kankakee. This letter was received by several members of the Cognis management team, including individuals who were involved in the decision to terminate Whitlow, prior to May 21, 2007. Although the NAACP letter did not specify that Whitlow made the complaint to

---

[4]At some point on May 11, 2007, Whitlow informed Cognis that he believed he was being discriminated against based on his race. Nevertheless, Plaintiffs do not argue that Whitlow was retaliated against based on this compliant, so this fact is not material to this case.

the NAACP, Cognis management assumed that the letter related directly to Whitlow's situation. At some point (although the date is not clear), NAACP representatives met with Denny Ohlmansiek, the Cognis plant manager, and Raul Rosado, Cognis' General Counsel, to discuss the NAACP's concerns about the LCA. Specifically, the discussion focused on the requirement that Whitlow (or presumably other individuals who had received a LCA) waive his rights to file charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Despite this meeting, from the facts offered to this court, there appeared to be no resolution.

On May 21, 2007, Whitlow reached out to Lemenager and requested that the LCA be modified so that he could retain his civil rights. It appears that Whitlow desired to be bound by the requirement that he comply with all requirements of his job, but desired to remove all restrictions from the LCA that restricted his civil rights. Lemenager responded that she would have to confer with management about his request, and then would get back to him about his request to modify the LCA. Thereafter, Whitlow returned to work for the day, and Lemenager conferred with management, indicating that Whitlow had raised a concern about protecting his civil rights. Later that same afternoon, Whitlow was called to a meeting with Lemenager. Lemenager told Whitlow that under no circumstances would the LCA be altered. Although it is clear that Whitlow raised the concern of the impact of the LCA on his civil rights, Cognis did not inform Whitlow that he did not have to give up his civil rights under the LCA. Furthermore, Cognis did not explain to Whitlow that the LCA did not actually prevent him from filing a charge of discrimination with the EEOC, even though the

4

wording in the LCA indicated that Whitlow would have been prevented from filing such a charge.[5]  Also, although Cognis's stated purpose of the LCA was simply to prevent Whitlow from engaging in the arbitration and grievance process, Whitlow was not told of this fact. Finally, Cognis did not inform Whitlow that paragraphs 5-7 of the agreements were limited in scope to past conduct by Cognis.  At this point, after learning that the LCA would be modified under no circumstances, Whitlow revoked the LCA, indicating that he refused to give up his civil rights.  Cognis was aware that Whitlow was revoking the LCA only because of his concern about his civil rights.  After Whitlow revoked the LCA, he was informed by Lemenager that he was now being terminated because he was unwilling to remain bound by the terms of the LCA.

## II.  OTHER COGNIS EMPLOYEES

Cognis had offered similar LCAs, as an alternative to termination, to other employees who were allegedly performing below expectations.  Specifically, the class of employees alleged in this case to have been retaliated against, in addition to Whitlow, include: (1) Dave Bunnell[6]; (2) Moses Hillman[7]; (3) Nathaniel Johnson[8]; (4) Ed Tholen[9]; and (5) Keith

---

[5]Specifically, the LCA states: "[Whitlow] agrees not to commence any action or preceding . . . before any state, federal or court or administrative agency, civil rights commission or agency, or any other forum."

[6]Bunnell entered into a LCA on November 15, 2004, and thereafter worked for Cognis until he was terminated for poor job performance on March 2, 2006.

[7]Hillman entered into a LCA on January 14, 2005, and thereafter voluntarily retired from Cognis on July 31, 2008.

[8]Johnson entered into a LCA on December 12, 2001, and continues to work for Cognis.

[9]Tholen entered into a LCA on January 6, 2006, and continues to work for Cognis.

Wright.[10]  There is no dispute that each of these five employees: (1) entered into a LCA with Cognis that contained a charge-filing bar, which was effective for a two-year period; (2) remained employed by Cognis after entering into the LCAs; and (3) were not subsequently fired for violating their LCA by exercising statutorily protected rights.  Although there are differences factually between these other employees, for purposes of this motion for summary judgment, these employees will be considered as a group.  Each of these employees have alleged, and testified to in their sworn depositions, that the harm suffered from entering into the LCAs was the belief that they were unable to file charges with the EEOC and were therefore unprotected from potential discrimination by Cognis for the duration of the LCAs.

## PROCEDURAL BACKGROUND

On December 19, 2007, Whitlow filed a charge of discrimination with the EEOC, alleging race discrimination.  On March 8, 2010, the EEOC sent Whitlow a Notice of Right to Sue.  On August 18, 2010, the EEOC filed its Complaint (#1) in this court, alleging that offering LCAs to employees to allow them to retain their employment with Cognis deprives the employees of equal employment opportunities and adversely affects their status as employees in retaliation for opposition to discrimination prohibited by Title VII.  On October 7, 2010, Whitlow filed a Motion to Intervene (#10), which was granted by Magistrate Judge David G. Bernthal on October 26, 2010.  On November 2, 2010, Whitlow filed his Intervenor Complaint (#14), alleging the same violation of Title VII as the EEOC alleged in its Complaint (#1).

---

[10]Wright entered into a LCA on September 12, 2006, and thereafter worked for Cognis until he was terminated in 2008.

On August 29, 2011, Defendant filed a Motion for Summary Judgment (#29) and a Memorandum in Support (#30), with exhibits attached. On September 29, 2011, the EEOC filed a Response (#32) to the Motion for Summary Judgment. On the same day, Whitlow filed a Response (#33) adopting the EEOC's arguments. On October 17, 2011, Defendant filed its Reply (#34).

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929 (citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998)).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite,

competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th

Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party

must show what evidence it has that would convince a trier of fact to accept its version of

events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004).

Specifically, to survive summary judgment, the nonmoving party "must make a sufficient

showing of evidence for each essential element of its case on which it bears the burden at

trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp.,

477 U.S. at 322-23. "Conclusory allegations not supported by the record are not enough to

withstand summary judgment." Basith v. Cook Cnty., 241 F.3d 919, 928 (7th Cir. 2001).

Nevertheless, uncorroborated testimony from the non-movant, even if self-serving, can be

evidence of disputed material facts and therefore prevent summary judgment, as long as such

testimony is based on personal knowledge or firsthand experience. Berry v. Chicago Transit

Auth., 618 F.3d 688, 691 (7th Cir. 2010).

## II. RETALIATION

Employers are prohibited from retaliating against an employee for complaining about

discrimination that violates Title VII. 42 U.S.C. § 2000e-3(a). A *prima facie* case of

retaliation may be satisfied using either the direct method or indirect method. Sitar v. Indiana

Dept. of Transp., 344 F.3d 720, 728 (7th Cir. 2003). In its Response (#32), Plaintiffs argue

only that they are able to satisfy the *prima facie* case under the direct method.[11] To satisfy

_____

[11]Presumably, Plaintiffs do not even attempt to claim reliance on the indirect method of retaliation because it is undisputed that Whitlow, as well as the other employees who received a LCA, were not meeting Cognis's legitimate expectations.

the direct method of a retaliation claim, the plaintiff must present direct evidence that: (1) he engaged in a statutorily protected activity; (2) an adverse action was taken by his employer; and (3) there was a causal connection between the activity and the adverse action. Id.

This court understands Plaintiffs' argument to advance two separate theories of retaliation, either of which, if supported by genuine issues of material fact and applicable law, would preclude summary judgment in Cognis's favor. Plaintiffs' first theory is that Whitlow took protected activity by challenging and revoking the LCA and was then fired in retaliation for these actions by Cognis. Plaintiffs' second theory is that offering an employee an ultimatum—either (1) waive certain rights, including your right to file charges with the EEOC or charges of discrimination under Title VII; or (2) accept your termination—constitutes prohibited retaliation. To analyze Plaintiffs' first theory, this court must determine if Plaintiffs are able to satisfy the *prima facie* case of retaliation under the direct method, construing the evidence in the light most favorable to the Plaintiffs. In considering Plaintiffs' second theory, alternatively, this court must consider whether Cognis's act of offering its employees an ultimatum is an actionable claim of retaliation.

### A. Termination for Revoking the LCA

Plaintiffs' first theory of direct retaliation is that Cognis retaliated against Whitlow by firing him after he revoked the LCA, which Plaintiffs allege constitutes protected activity. Obviously, there is no dispute that Whitlow suffered an adverse employment action when he was terminated on May 21, 2007. Cognis, although not explicitly, concedes that challenging the LCA was protected activity. However, Cognis argues emphatically that the decision to

9

discharge Whitlow happened before the protected activity and therefore precludes a finding

that there was a causal connection between Whitlow's protected activity and his termination.

Therefore, as to this theory, the only dispute focuses on causation. This court will first

address the factual question of when Whitlow was discharged, then address whether

Whitlow's termination was causally related to his protected activity.

1. *Timing of Whitlow's Termination*

Cognis argues that it is entitled to summary judgment primarily, if not exclusively, on

the basis that it made the employment decision—to terminate Whitlow—on May 10, 2007,

prior to any protected activity. In this court's opinion, this argument defies simple logic.

The undisputed <u>facts</u>, as opposed to arguments of how the facts should be viewed, are as

follows. Cognis had significant performance concerns with Whitlow, and as a result, on May

10, 2007, made the decision to offer Whitlow a choice: (1) he could sign the LCA at issue in

this case; or (2) he would be fired, effective immediately. Cognis did not decide to

unequivocally terminate Whitlow, which it had every legal right to do, on May 10, 2007—

rather, they offered him this ultimatum.[12] The language used in the LCA itself makes this

clear:

> Cognis has decided to offer Whitlow one last chance to **continue his employment in lieu of termination** . . . . [Cognis] agrees to offer Whitlow the opportunity to retain his position. Whitlow agrees to fully comply with all requirements of the job.

[12]Although Cognis's motivations in this particular case are not clear, it appears Cognis either: (1) felt this LCA would improve Whitlow's performance to such a level that Cognis would benefit from an ongoing employment relationship; or (2) if Whitlow entered into the agreement, they would be protected from later grievance processes. Either way, they decided that offering the LCA, as opposed to firing Whitlow on the spot, was to their advantage.

(emphasis added). Whitlow made the decision to sign the LCA, which he did on May 11,

2007, and continued to work, in the same capacity as he had prior to May 10, 2007, until

May 21, 2007. On May 21, 2007, after Cognis explicitly refused to modify the LCA in any

way, Whitlow revoked the LCA that he had entered into on May 11, 2007. Immediately,

upon this revocation, Cognis terminated Whitlow's employment—because he had voluntarily

revoked the LCA.

Although there is no dispute the actual termination occurred on May 21, 2007, it is

also clear from the facts that Whitlow would have been terminated on May 10, 2007, if he

refused to enter into the LCA. Therefore, his continued employment after May 10, 2007, was

contingent on Whitlow willingness to agree to and uphold the terms of the LCA. That being

said, it is equally clear that Whitlow would have retained his job if he was willing to waive

his protected rights, assuming of course that his job performance was satisfactory. In

summary, there was a three-step sequence of events that led to Whitlow's termination by

Cognis: (1) due to Whitlow's poor performance, on May 10, 2007, Cognis decided to offer

him an ultimatum: either agree to the LCA or lose your job; (2) Whitlow initially agreed to

the LCA and kept his job; and (3) on May 21, 2007, after revoking his initial acceptance of

the LCA, Cognis terminated him as promised less than two weeks earlier.

## 2. *Causal Connection*

The adverse action in this case—Whitlow's termination—took place on May 21,

2007. Cognis and the Plaintiffs seem to agree that Whitlow's termination was directly

caused by his revocation of the LCA. No argument has been advanced by either party that

11

any other causal factor played a role in Whitlow's termination on May 21, 2007.[13]

Notwithstanding the lack of dispute between the parties about the sequence of events leading

to his termination, the parties dispute whether the sequence of events is direct evidence of

causation between the protected activity and Whitlow's termination.

Specifically, Cognis argues that Whitlow was not fired because he wanted to protect

his civil rights, but rather, because he revoked the LCA. There is some merit to this

argument, as Whitlow was not terminated at the moment he asked to amend the LCA to

protect his civil rights.[14] In fact, after making the request to make such a modification, he

attended a meeting in which he was told that the LCA would not be modified under any

circumstances. At that point, it appears that had Whitlow simply conceded, and decided to

remain bound by all terms of the LCA, he would not have been terminated. Whitlow,

however, did not make this decision. He voluntarily revoked the LCA leading to his

immediate termination. The direct cause of his termination was not his request to protect his

civil rights, but rather the decision to revoke the LCA which Whitlow believed, correctly,

restrained his civil rights.

On the other hand, Plaintiffs argue that Whitlow's act of revoking the LCA itself is a

_____

[13]Although Plaintiffs claim Whitlow undertook other protected activity—specifically his complaints of racial discrimination to Cognis representatives—under the direct method of retaliation, there is no evidence Whitlow lost his job in retaliation for these complaints.

[14]There would be no question that Whitlow was retaliated against if he was terminated for asking to amend the LCA. Similarly, there would be clear direct evidence of a causal connection: (1) if Whitlow filed a complaint with the EEOC only to be immediately fired by Cognis for violating the LCA; or (2) if Whitlow was fired on May 11, 2007 after indicating that he believed he was being discriminated based on his race. However, in this case, these situations did not occur, making the causation analysis more complicated.

protected activity, not simply his prior requests to modify the LCA. Specifically, Plaintiffs

argue that revoking the LCA can be seen as opposing a practice that Whitlow believed to be

an unlawful employment practice. If this analysis of the facts is considered to be accurate,

there is no question that there is sufficient direct evidence of causation between Whitlow's

protected activity—revoking the LCA—and his termination to preclude summary judgment.

Therefore, this court finds that there is a genuine issue of material fact which precludes

summary judgment in favor of Cognis on the issue of whether or not there was a causal

connection between Whitlow's protected activity and his termination.

## B. Is Cognis's Act of Offering Employees LCAs Retaliatory?

There is no genuine issue of material[15] fact as to what occurred with regards to the

LCAs offered by Cognis in this case to Whitlow and the five other Cognis employees

(referred to hereinafter as "other employees"). Rather, the resolution of this theory of

retaliation, with the exception of the question of damages, depends on a legal, rather than

factual, question: does offering an employee an ultimatum—either (1) waive certain rights,

including the right to file charges with the EEOC or charges of discrimination under Title

VII; or (2) accept your termination—constitute retaliation under Title VII. In other words, is

threatening retaliation, retaliation under Title VII? The language of the relevant statute is as

follows:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because he has opposed any practice made an unlawful

---

[15]Although there certainly are a number of disputed facts, they do not have an effect on the legal question in this case: did Cognis retaliate against Whitlow, and the other employees, by requiring them sign the LCA if they wanted to keep their job.

employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).  Applying the plain language of the statute, this court would be able to find as a matter of law that Cognis's use of LCAs constitutes an adverse employment action in two hypothetical situations: (1) an employee is offered the LCA *because* he opposed a practice made unlawful by Title VII or made a charge under Title VII; or (2) the LCA was enforced, and an employee was fired, *because* he opposed a practice made unlawful by Title VII or made a charge under Title VII.  However, in this case, neither of these two scenarios occurred.  Whitlow, and the other employees, were offered the ultimatum of entering into an LCA or losing their jobs because they were not performing their jobs to Cognis's legitimate expectations—not because they opposed a practice made unlawful by Title VII or made a charge under Title VII.  Later, Whitlow lost his job because he decided that he was not willing to waive his civil rights under the terms of the LCA, not because he breached the unenforceable provisions of the LCA.[16]

The language contained in 42 U.S.C. § 2000e-3(a) does not explicitly prohibit *threats* of retaliation.  The statutory language envisions a scenario where the individual has already undertaken protected activity and suffers discrimination, not simply the threat of discrimination, as a result of that activity.  Nevertheless, although the strict text of the statute might not extend to the facts of this case, precedent, as well as logic, suggest that certain

---

[16]Sadly, Whitlow did not have legal advice directing him that the LCA would be unenforceable and therefore he could continue working and still file a claim with the EEOC.  If Cognis chose to fire him as a result of this protected action, this court would have no trouble finding that he suffered impermissible retaliation.

types of threatened retaliation are also actionable.  The Supreme Court has explained that the

primary purpose of the antiretaliation provisions of Title VII is: "[m]aintaining unfettered

access to statutory remedial mechanisms."  See Robinson v. Shell Oil Co., 519 U.S. 337, 346

(1997); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006) ("The

antiretaliation provision seeks to secure that primary objective by preventing an employer

from interfering (through retaliation) with an employee's efforts to secure or advance

enforcement of the Act's basic guarantees.").  Recently, the Supreme Court explained that in

the retaliation context, an actionable employment action is any action that "might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."

White, 548 U.S. at 68, 73 (2006) (upholding a jury determination that the plaintiff had

suffered a material adverse action, explaining that "[a] reasonable employee facing the choice

between retaining her job (and paycheck) and filing a discrimination complaint might well

choose the former.").

There is no question that threatening retaliation certainly may "dissuade[] a

reasonable worker form making . . . a charge of discrimination."  Id.  Moreover, in this case,

the language of the LCAs did not merely threaten retaliation, it promised retaliation, in the

form of termination if Whitlow, or the other employees, exercised their statutorily protected

rights.  Therefore, a finding that offering an employee an ultimatum—waive your right to file

a claim of discrimination or accept your termination—constitutes retaliation would help to

achieve the primary purpose of the antiretaliation provisions as explained by the Supreme

Court.

In addition to the policy rationale supporting a finding that threatening retaliation is

actionable, the Seventh Circuit has hinted that the threat of retaliatory action would be

actionable as retaliation under Title VII.  See Beckel v. Wal-Mart Assoc., Inc., 301 F.3d 621,

624 (7th Cir. 2002) ("[I]f there were admissible evidence that [the employer] had threatened

the [employee] with firing her if she sued . . . [s]uch a threat would be a form of anticipatory

retaliation, actionable as retaliation under Title VII.").  Other courts have also found that

threatening retaliation is distasteful and should not escape enforcement under antiretaliation

provisions.  See, e.g., Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 108 (D.

Mass. 1998) ("If . . . threats of retaliation are not actionable . . . then a plaintiff or

government enforcement body would have to wait until an employer actually retaliates before

invoking the protections of [antiretaliation rules].  Where the threatened retaliation is clearly

illegal, where it chills the redress of legal rights, however, such a conclusion can only be

described as absurd.").

Although this court does not believe that the result in this case is governed by EEOC

v. Board of Governors, 957 F.2d 424 (7th Cir. 1992), this court does find the Seventh

Circuit's reasoning in that case to be instructive as to the legal issue in this case.  In Board of

Governors, the Seventh Circuit held that an employer's policy—which allowed grievances to

proceed to arbitration only if the employee refrained from undertaking protected

activity—was discriminatory on its face.  Id. at 431.  The Seventh Circuit rejected the

employer's argument that there was no retaliation because the employer had no legal

obligation to provide the benefit of allowing grievances in the first place.  Id. at 430 ("A

benefit that is part and parcel of the employment relationship may not be doled out in a

discriminatory fashion, even if the employer would be free . . . not to provide the benefit at

16

all."). However, in contrast to this case, the employees in <u>Board of Governors</u> had a

contractual right to the benefit that was taken away if they engaged in protected activity. <u>Id.</u>

Nevertheless, the Seventh Circuit's reasoning in <u>Board of Governors</u> indicates that the fact

that there was a contractual obligation that was taken away was not a critical element in

reaching its conclusion that the policy was retaliatory. Specifically, the Seventh Circuit

explained the policy justification for its holding as follows:

> To hold for the [employer] would allow it to deter its employees' exercise of their
> [protected statutory] rights by imposing adverse employment consequences. Statutory
> provisions against retaliation such as those in the ADEA and Title VII protect
> employee's right to participate in protected activity and aid the work of the EEOC
> which depends upon employee cooperation. Consequently, we fully agree [with the
> district court's] conclusion [that the policy violates the antiretaliation provision]
> because it is discriminatory on its face.

<u>Board of Governors</u>, 957 F.2d at 431 (internal citations omitted). In this case, there is no

dispute that Whitlow, or the other employees, did not have a contractual right to be employed

by Cognis. However, it is clear that allowing Cognis to require its employees to enter into

LCAs to retain their jobs allows it to deter its employees' exercise of their statutorily

protected rights, whether or not the employees had a contractual right to continued

employment.

Finally, this court is not persuaded by Cognis's argument that cases which hold that

claim waivers are permissible in the severance context provide precedent for a holding that

the LCAs at issue in this case are not facially retaliatory. <u>See, e.g.</u>, <u>EEOC v. Sundance</u>

<u>Rehabilitation Corp.</u>, 466 F.3d 490, 501 (6th Cir. 2006); <u>Isbell v. Allstate Ins. Co.</u>, 418 F.3d

788, 793 (7th Cir. 2005). Although this court does not dispute that a waiver of claims, for

past conduct which potentially violates Title VII, may be waived by an employee who is

being terminated in exchange for additional severance benefits, the facts of this case are

clearly distinguishable from that type of situation.  First, the LCAs at issue in this case did

not merely seek to bar claims based on past conduct, they attempted to bar claims based on

all past and future conduct of Cognis for the two-year term of the LCA.  Second, severance

benefits are not key aspects of the employment relationship—as employment itself certainly

is.  Finally, in the severance context, the employment relationship has come to an end,

regardless of whether or not the employee decides to waive their claims against the employer.

In this case, Cognis employees were given the choice to *either* retain employment or waive

their protected statutory rights.  This court finds that these distinctions are sufficiently

important to determine that cases addressing the severance context do not provide

compelling, much less binding precedent for this case.

In summary, this court finds that there is sufficient legal support for this court to reach

the conclusion that Cognis's threat of retaliation contained in the LCAs constitutes a

retaliatory policy under Title VII.  This court is particularly troubled by the willingness of

Cognis to offer LCAs to employees when it apparently was well aware that certain aspects of

the LCAs were unenforceable[17] and violate public policy.  Admittedly, the LCAs do offer an

alternative to termination and provide an employee with a chance to retain their position with

Cognis if their performance improves.  Nevertheless, these LCAs would likely have been

equally effective at improving the performance of these employees without the unenforceable

---

[17]See, e.g., EEOC v. Cosmair, Inc., 821 F.2d 1085, 1090 (5th Cir. 1987) ("We hold that an employer and an employee cannot agree to deny to the EEOC the information it needs to advance [the public interest in preventing employment discrimination].  A waiver of the right to file a charge is void as against public policy.").

18

provisions at issue in this case.  Specifically, it is unlikely that the particular provisions at

issue in this case—those which had the effect of making the employees believe that they no

longer had any protection from their employer's actions, even if clearly discriminatory—had

the effect of improving their performance.  Rather, these provisions simply had the effect of

protecting Cognis from statutorily protected activity of its employees for the duration of the

LCA, a goal which cannot be achieved legally.

IT IS THEREFORE ORDERED THAT:

     (1) Defendant's Motion for Summary Judgment (#29) is DENIED.

     (2) The jury trial scheduled for January 23, 2012, at 9:00 a.m. is VACATED.

     (3) The parties are directed to contact Magistrate Judge David G. Bernthal's chambers

to schedule a settlement conference.

     (4) The final pretrial conference scheduled for January 6, 2012, at 3:30 p.m., is

converted to a status conference by telephone to discuss the progress of the settlement

conference between the parties.

     (5) Plaintiffs are granted leave, until January 6, 2012, to file a motion for summary

judgment on the issue of whether Defendant retaliated against Whitlow and the other

employees.[18]  Specifically, Plaintiffs are invited to advance arguments that would support a

finding as a matter of law that Defendant retaliated against Whitlow by requiring him to sign

the LCA which is void as against public policy, and subsequently terminating him solely on

the basis of his revocation of this void contract—not on the basis that Whitlow had any

_____

     [18]If summary judgment is granted in favor of the Plaintiffs on this issue, the only
remaining issues before this court would be the appropriate remedies for Defendant's retaliatory
conduct and policies.

19

performance problems.[19]  Additionally, Plaintiffs are invited to advance arguments that

would support a finding as a matter of law that Defendant retaliated against Whitlow and the

other employees by requiring them to sign a LCA as a condition of continued employment.

ENTERED this 12th day of December, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

---

[19]Cognis waived any argument that Whitlow was fired for failing to satisfy Cognis's
legitimate expectations when they allowed Whitlow to continue in his employment under the
LCA.  There is no dispute that he was fired solely for revoking the LCA on May 21, 2007—not
because he had failed to meet Cognis's legitimate expectations after signing the LCA.